AYRES, Judge.
This is an action in tort wherein plaintiffs, husband and wife, seek to recover damages, she for personal injuries, permanent disability, loss or impairment of eyesight, pain and suffering, and he for reimbursement of hospital and medical expenses incurred and to be incurred in the treatment of his wife’s injuries which were sustained in an accident on April 12, 1971, on the premises and at the residence of defendant’s assured, Mrs. Donnell Bell, on Susan Street in the City of Mansfield.
Made defendant is The Aetna Casualty and Surety Company, insurer of both the Sistrunk Chevrolet Impala and of the Bell “98” Oldsmobile.
*786 Mrs. Sistrunk sustained the injuries aforesaid when, at the instance of Mrs. Bell, seated in the driver’s seat of the Sis-trunk car, she, Mrs. Sistrunk, reached inside the car through an open door and released the emergency brake. Through Mrs. Bell’s alleged negligence, the car moved backward, and the open door dragged or knocked Mrs. Sistrunk to the paved driveway.
Negligence charged to Mrs. Bell consists of her failure to keep and maintain a lookout or to keep the automobile under control in a parked position or to maintain her foot on the brakes, or to take any action with respect to the operation of the car to prevent it from rolling backward while Mrs. Sistrunk was in a position of peril.
The defeñse is a denial of negligence on the part of Mrs. Bell and the assertion of negligence on the part of Mrs. Sistrunk as the sole cause or, in the alternative, a contributing cause of the accident. Negligence charged included the releasing of the emergency brake knowing that the left door was open and in a position to strike her, and knowing that the automobile was parked on an incline with its motor running ready in reverse gear to roll backward upon release of the brake. It is additionally contended that Mrs. Sistrunk assumed the risk of injury and failed to take any precaution for her own safety.
The trial court concluded that the accident was caused by the combined and concurring negligence of both Mrs. Sistrunk and Mrs. Bell and thus that Mrs. Sistrunk was guilty of contributory negligence which barred her from the recovery of damages.
From a judgment accordingly rejecting plaintiffs’ demands, they appealed.
No substantial dispute exists as to the occurrence of the accident, nor as to the pertinent facts immediately preceding and following its occurrence. The Sistrunks were invited by the Bells to' the latters’ home as social guests; in fact, Mrs. Bell was Mrs. Sistrunk’s niece. On reaching the Bell residence, Mr. Sistrunk parked the Chevrolet Impala on the driveway behind the Bell’s Oldsmobile parked in the carport. The driveway was on a decline to the street level. On parking the car, Sis-trunk placed the gear of his car in a parked position and, moreover, applied the emergency brake.
Soon after the Sistrunks entered the Bell residence, Mrs. Bell announced a trip to a grocery for bread and soft drinks and invited Mrs. Sistrunk to accompany her, whereupon Mr. Sistrunk explained that his car blocked the Bell automobile and handed his car keys to Mrs. Bell, suggesting that she drive his car. Mrs. Bell explained that she had rather go in her own car. This required the removal of the Sistrunk car. Thereupon, Mrs. Bell entered and seated herself in the driver’s seat of the Sistrunk car, after which she started the motor with the gearshift lever in “Park,” but shifted to reverse. The car, however, could not be moved either forward or backward inasmuch as Mrs. Bell could not release the emergency brake.
Mrs. Bell, after several unsuccessful attempts to release the emergency brake, opened the car door and informed Mrs. Sistrunk of her failure or inability to do so. In that connection Mrs. Sistrunk testified that Mrs. Bell said to her, “I can’t release this emergency brake. You are going to have to come release it for me.” She stated she replied, “Just a minute and I’ll release it for you.” That she made the latter statement was denied by Mrs. Bell, who testified that Mrs. Sistrunk answered her by saying, “Just a minute. We might have to get Monroe [Mrs. Sistrunk’s husband].”
Mrs, Bell’s testimony is to the effect that the actions of Mrs. Sistrunk in reaching into the automobile and releasing the brake were so quickly done, without warning, notice, or knowledge on her part, that she (Mrs. Bell) was without time or op *787 portunity to do anything to prevent just what occurred in that instance. Defendant characterized Mrs. Sistrunk’s actions as foolhardy in reaching inside the car and releasing the brake, knowing that the motor was running, without first having ascertained that the car was not in reverse gear.
The record does not support these contentions. Upon Mrs. Bell’s call, Mrs. Sis-trunk took time to place “on the concrete,” to the left and about three feet from the front end of the car, the empty bottles and the purse of Mrs. Bell which she was carrying. Thereafter she walked to the left door of the car, several steps away, and opened the door which had been closed but not latched. She then reached inside the car and down to the lever which controlled the emergency brake. On the first or second pull, the brake released. Mrs. Bell had in the meantime reshifted to the reverse gear. When the brake was released the car lurched or “shot” backward, the open door knocking and dragging Mrs. Sistrunk down to the concrete driveway. Her right side, head, and shoulder struck the concrete surface. The left front wheel ran backward over Mrs. Sistrunk’s left foot and leg. The car continued its backward movement down the decline, across the street and onto the driveway of a neighbor.
Mrs. Bell testified, “If I had known she [Mrs. Sistrunk] was going to pull the brake I would have put it in ‘Park’.” There is no question but that Mrs. Bell had ample time and opportunity to place the car in “Park” by the simple process of flipping the lever to its proper position which, at most, would have required only an instant. Her statement, therefore, that she had no time to think is not in accord even with her own testimony to the effect, as noted above, that after her call to Mrs. Sistrunk, Mrs. Sistrunk took the time to lay down the objects held in her hands and walk to the left door of the car. All the things done by Mrs. Sistrunk did not happen in an instant but required an appreciable length of time.
The record, moreover, establishes beyond any peradventure of doubt that Mrs. Bell knew, or had reason to know, and should have known, that Mrs. Sistrunk approached the car for the very purpose of releasing the brake. In this regard Mrs. Sistrunk testified, as aforesaid, that Mrs. Bell called her and stated, “You are going to have to come release the brake for me.” Mrs. Bell herself testified that after she opened the car door, she called to Mrs. Sistrunk saying, “I can’t release it. It’s stuck or I just can’t release it. It just won’t come loose,” to all of which, she stated, as already noted, Mrs. Sistrunk replied, “Just a minute,” which clearly implied that Mrs. Sistrunk would attempt to release the brake for Mrs. Bell. Mrs. Bell nevertheless testified that she knew of no other reason or purpose why Mrs. Sis-trunk came to the car except to release the brake.
In addition to Mrs. Bell’s failure to place the gearshift in “Park,” which would have prevented the movement of the car upon release of the brake, she failed to- apply the foot brakes which were shown without question to have been in excellent condition. The brakes were, indeed, sufficient to and did, in fact, hold the car on the decline, even when the power of the motor was used in an effort to move the car. Mrs. Bell nevertheless testified she placed all her weight upon the brakes without effect so far as slowing down the movement of the car.
Mrs. Sistrunk, 58 years of age, had never driven an automobile; however, Mrs. Bell, a younger woman, had 27 years of experience in driving and operating a motor vehicle. Mrs. Sistrunk was familiar with Mrs. Bell’s driving; she had no previous record of accidents. Mrs. Sistrunk had no misgivings as to her safety in entrusting herself to Mrs. Bell’s driving. Nevertheless, when Mrs. Sistrunk reached the car and stood to the rear of the open door Mrs. Bell knew, or should have known from her driving experience and from the decline of her own driveway, that when *788 the brakes were released without further ado, the car would roll down the driveway and that the door would strike Mrs. Sis-trunk. However, Mrs. Bell took no' precaution or made any effort to prevent the accident. The physical facts, including the lurch of the car backward, warrant the conclusion that more than likely Mrs. Bell’s foot was on the accelerator rather than on the brakes.
We are convinced from our review of the record that Mrs, Bell was guilty of negligence constituting a proximate cause of the accident. It was she, seated in the driver’s seat, who placed the car in operation and started the motor; and it was she who should have had it under control inasmuch as she well knew of Mrs. Sistrunk’s approach to the car and the purpose for which she was coming. When Mrs. Bell called to Mrs. Sistrunk for the release of the brake, she knew the condition of her driveway, as aforesaid, and the likelihood that the car, upon the release of the brakes, would naturally roll backward. She knew, or should have known, that under the circumstances it was necessary that she either apply the foot brakes or shift the gear selector lever to “Park.” She had ample time to do either, or both, before Mrs. Sistrunk reached the car. She did neither nor did she take any other action whatever to prevent the accident. The result of Mrs. Bell’s failure and negligence as aforesaid was clearly foreseeable by an ordinarily reasonable and prudent motorist and should have been anticipated. Thus, there is no basis for belief in Mrs. Bell’s testimony ■that she applied the brakes on the car but was unable to stop it. The brakes, as already noted, were sufficient to hold the car on the decline of the driveway even when the power of the motor was applied to move the car, and with that power applied the car could not be budged from its position either forward or backward.
The trial court concluded that Mrs. Bell was negligent. From our own review of the record, we concur in that finding.
With respect to the conclusion reached below that Mrs. Sistrunk was guilty of negligence even to a degree of contributing as a causal factor to the occurrence of the accident, we find ourselves in disagreement. From the facts detailed hereinabove, we can conceive of no basis on which Mrs. Sistrunk can be said to have been at fault. The most she did was to place herself behind the open car door. Taking this position was necessary to reach the brake release lever. She had no fear that Mrs. Bell would not maintain control of the car. Since Mrs. Bell called to her to release the brake, there was no basis or reason for Mrs. Sistrunk to have anticipated that Mrs. Bell would not, in the operation or control of the car, protect her from being run over.
However, if it could be said that Mrs. Sistrunk placed herself in a position of peril, of which she neither knew nor was able to extricate herself, the doctrine of last clear chance would be clearly applicable.
Under the leading cases of Rottman v. Beverly, 183 La. 947, 165 So. 153 (1935), and Jackson v. Cook, 189 La. 860, 181 So. 195 (1938), the principle was firmly established in the jurisprudence of this State, as evidenced by the many subsequent citations of these authorities with approval, that where motor vehicles are involved in an accident and where the motorist sees, or should have seen by the exercise of reasonable and due care, a person in peril, of which such person is unaware, or where he is unable to extricate himself, the duty devolves upon the motorist to use every possible available means to avert injury, and if a motorist fails to perform that duty the last clear chance applies even though the person’s negligence continues to the very moment of the accident.
Evans v. Thorpe, 175 So.2d 418 (La.App., 2d Cir.1965);
Howard v. Fidelity & Casualty Company of New York,
179 So.2d 522 (La.App., 3d Cir.1965);
*789 Richard v. Southern Farm Bureau Casualty Ins. Co.,
212 So.2d 471 (La.App., 3d Cir.1968);
Goodman v. Southern Farm Bureau Cas. Ins. Co.,
216 So.2d 881 (La.App., 2d Cir.1968);
Sanders v. National Surety Corporation,
230 So.2d 847 (La.App., 2d Cir.1970).
For all the aforesaid reasons, we are of the opinion that the showing made in this case is insufficient to establish that Mrs. Sistrunk was guilty of any negligence with respect to the accident involved here. To the contrary, the evidence establishes her freedom from fault.
Accordingly, our attention must be directed to the nature, duration, and extent of Mrs. Sistrunk’s injuries and the amount of damages or loss sustained by her as a result of the accident concerned in this litigation.
Mrs. Sistrunk was hospitalized on the day of the accident in the DeSoto General Hospital and was thereupon initially treated by Dr. John S. Wilson who, due to a questionable fracture of her foot, applied a short leg cast to her leg.
Plaintiff’s family physician, Dr. J. L. Grindle, a general practitioner and surgeon, saw plaintiff the day following the accident and continued with her medical care and treatment thereafter. Collaborating with Dr. Grindle were Drs. Donald E. Texada, an ophthalmologist, Loyd C. Megison, Jr., a neurosurgeon, and Don H. Burt, an orthopedist, all of Shreveport.
Upon the occasion when Dr. Grindle first saw plaintiff, following the accident, plaintiff complained of pain in her right shoulder, arm, wrist, left foot, ankle, and in the right side of her face. Bruises and lacerations were noted at the time in the affected areas of her body. These became more noticeable and pronounced within a day or two when swelling and discoloration set in. She complained, too, that she could not see out of her right eye. X-rays of the areas of which plaintiff complained were made. These disclosed only a fracture of the right elbow. A long arm cast was applied from the armpit, extending to and covering the wrist. The shoulder was described as being very tender and painful. It was likewise noted that tenderness was experienced in the right temple, that is, the area around and back of the eye. A diagnosis at the time showed that Mrs. Sistrunk had experienced bleeding, or hemorrhaging, back of the eye due to a blow to the right side of the head.
With respect to plaintiff’s loss of vision, Dr. Grindle expressed an opinion that such loss was due to some retrobulbar swelling and hemorrhaging, that is, bleeding, behind the eye. Dr. Texada, after referring to Dr. Breffeilh’s notes of April 19, 1971, noting that Mrs. Sistrunk had commotio retinae at that time, expressed the opinion that the pigmentary changes in her eyes were from bleeding in the eyes usually caused by trauma.
Plaintiff’s corrected vision in the right eye varied between a range of 20/40, 20/50, 20/70, 20/80, and 20/200, with no prospects or likelihood for improvement. In this calculation it was explained that 20/20 indicated normal eyesight, while 20/40, 20/50, 20/70, 20/80, or 20/200 meant that plaintiff could only see at 20 feet which she could and should see at the greater distances with the possession of normal eyesight.
The consensus of the experts was also that plaintiff had sufficient blindness in her right eye to affect her depth perception in the other eye. A result of such defects and their importance, it was explained, was that one so affected could not judge a car’s distance down a highway nor the distance of a glass when being filled with liquids, nor the distance of steps on a stairway in walking either upward or downward. The consensus was that for all practical purposes plaintiff was blind in her right eye.
*790 With corrected vision of 20/80, it was stated, plaintiff could possibly see a person across a room but not be able to recognize the person. In this connection, it was noted that vision of at least 20/40 was required for a driver’s license. Where vision could not be corrected beyond 20/200, such vision was comparable to total blindness.
Dr. Megison’s diagnosis was that plaintiff had post-traumatic optic atrophy such that normal vision would not likely return, so he testified, notwithstanding plaintiff’s belief that she had, to an extent, improved.
The elbow, limited in movement, together with the traumatic bursitis or tendinitis found in the shoulder adversely affected and limited the movements of plaintiff’s arm, particularly with reference to raising the arm. By a separate operation to reduce the limitation of motion in plaintiff’s shoulder and the pain suffered therein, adhesions were broken loose. The extension of the arm, by reason of the injuries to the elbow, was reduced by at least 15-20%.
After the cast applied to plaintiff’s arm was removed, in May, she again complained of considerable pain in her wrist. X-rays made at that time disclosed no evidence of fractures; nor were there any fractures of the wristbones. Pain was also in evidence when plaintiff twisted her hand either inwardly or outwardly. She could not close her hand to make a fist. There was always a gap of approximately an inch between the tips of her fingers and her hand. The injuries placed pressure upon the principal nerve to the fingers and thumb. The pressure at the wrist necessitated an additional operation requiring a 3-day hospitalization.
The condition of the right wrist was diagnosed by Dr. Burt as a carpal tunnel syndrome, a term applied to a particular group of symptoms resulting from pressure on the median nerve at the wrist. The nerve is pinched or compressed at the wrist, and numbness results from that point, reducing the feeling to pinprick and resulting in a decrease of muscle size and strength in the area of the base of the thumb. Pain is characteristic of this condition, varying in classification from mild and moderate to severe, and radiates from the wrist to the hand, occasionally up the arm and, at times, to the shoulder. The pain extends to the fingers, as does the numbness and a stinging sensation.
On the occasion of the second operation, plaintiff was placed under a general anesthetic when, by surgery, the strong ligament stretched across the wrist was cut completely through to permit the nerve to “ride up free.” In the instant case, there was a further restriction by the sheath of the nerve, the outer portion of which was required to be removed for a distance of approximately two inches across the wrist. There was also a little thickening of the nerve branch going up to the thenar group of muscles. The sheath was likewise removed from this. Also, due to limitation of movement in the shoulder, plaintiff’s shoulder was manipulated while she was under anesthesia. Thus the ad-hesions which had developed about the shoulder joint were broken up so that a full range of motion of the shoulder could be redeveloped.
The conditions with reference to the wrist and shoulder, which required surgery as aforesaid, were, in the doctor’s opinion, related to and caused by the trauma sustained in the accident. The surgery was said to have been successful, and the results generally expected were produced. The operation was performed on September 14, 1971. Dr. Burt saw plaintiff for the last time on October 28, 1971. On that occasion she had a disability of 30-35% in her arm, but as of the date of trial such disability was estimated at 25-30%. Further improvement was expected after six or eight months to a year to bring the disability down to probably only 4 — 5%.
Unfortunately, the expected maximum improvement had not been realized by the time of trial. Mrs. Sistrunk could not bend her wrist; pain persisted in her hand, *791 and there was atrophy over her right arm. Her hand was swollen, and her fingertips were sweaty. Dr. Grindle’s examination during the trial disclosed that pressure on her hand caused pain; there was atrophy around the thumb, and pain resulted from the twisting of her wrist. She was unable to flex and fully extend her right hand at the wrist due to a generally limited range of motion. There was a loss of strength or gripping power in her hand, and she remained unable to form a fist. Dorsal muscle structure between the wrist and elbow was atrophied from disuse. The doctor at the time estimated there was a 15-20 degree of loss of motion in the elbow, and concluded that she would have a 50% permanent disability in her right arm. She remained disabled to do housework or to work at any gainful employment.
Testimony offered by plaintiff as to the nature, duration, and extent of her injuries, pain, suffering, and disability is in the record, uncontradicted.
Mrs. Sistrunk was initially hospitalized for a period of 17 days and thereafter, as heretofore noted, for an additional period of three days. It has been established that expenses incurred in plaintiff’s treatment, including hospital, medical expenses, and drugs, aggregated $2,432.16. No contradictory evidence is contained in the record.
The record admits of no doubt that Mrs. Sistrunk suffered considerable pain, severe and excruciating at times, and that she will in all probability continue to suffer some discomfort and inconvenience because of the injuries sustained in 'the accident. Nor is there any question but that she sustained some permanent disability to her right shoulder, arm, and wrist. No permanent disability was established in the left foot and ankle sufficient to warrant an award therefor. Nor is there any question but that plaintiff has sustained, for all practical purposes, loss of the sight of her right eye or impairment thereto equivalent to such a loss. Moreover, because of this loss or impairment, plaintiff has further sustained a loss of depth perception in the left eye. This loss appears to be permanent.
From our review of the record and for the reasons hereinabove assigned, we are of the opinion that plaintiff Mrs. Nevada Brown Sistrunk has sustained injuries and damages as a result of the accident as follows:
Pain and suffering.$ 7,500.00
Permanent disability. 3,500.00
Loss or impairment of sight of her right eye and the loss of depth perception . 20,000.00
Total . $31,000.00
For the reasons assigned, the judgment appealed is annulled, avoided, reversed, and set aside; and
It is now ordered, adjudged, and decreed there be judgment herein in favor of plaintiff T. Monroe Sistrunk in the sum of $2,432.16 and in favor of plaintiff Mrs. Nevada Brown Sistrunk in the sum of $31,000.00 against the defendant The Aetna Casualty and Surety Company, with legal interest on both of the aforesaid amounts from judicial demand until paid, and for all costs of this suit, including expert-witness fees of $100.00 each for Drs. J. L. Grindle, Donald E. Texada, Don H. Burt, and Loyd C. Megison, Jr., which are taxed as costs.
Reversed and rendered.